BLUM v. FORD, COMMISSIONER OF REVENUES.

4-4758

Opinion delivered June 28, 1937.

*Jay M. Rowland,* for appellants.

*J. Hugh Wharton,* for appellee.

MEHAFFY, J. On May 1, 1937, D. L. Ford, commissioner of revenues, served an order on each of the appellants, which order stated that he had revoked their permits to sell beer in their respective places of business for the reason that they had sold liquor of greater alcoholic content than allowed by their permits, and otherwise violated the law, and violated their contract and oath by selling said liquor, and accepting bets on horse races, and ordered them to immediately stop the sale of beer in their places of business, and notified the wholesalers not to sell appellants any more beer.

On May 5, 1937, appellant, Louis Blum, filed a petition for injunction in the Pulaski Chancery Court alleging that the Commissioner of Revenues had attempted to revoke his permit by sending C. B. Lovell, Sr., to his place of business and tearing the permit from the wall and asked that the Commissioner of Revenues be restrained from interfering with his beer business, and from demanding the wholesalers to refrain from selling him beer, and served summons on said Commissioner of Revenues to appear in the Pulaski chancery court on May 6 for

hearing on a petition for a temporary restraining order, which order was granted by the court, and appellant was allowed to continue the beer business.

Thereafter, on May 17th, the other appellants, Southern Club and Ohio Club, adopted the pleadings of appellant, A. Louis Blum, and all denied that they had violated any oath or contract with the Commissioner of Revenues, or knowingly violated any law, and they intervened in said action as plaintiffs, and adopted all the pleadings and allegations of said plaintiff.

On the same day the appellants filed a motion to require the Commissioner of Revenues to make his allegations of law violation more specific, which motion was overruled. Appellants then filed demurrer, which was overruled, and response was filed to plaintiff's motion to make the charges more specific.

The appellee filed an answer denying all the material allegations in appellants' petition, and asked that the temporary restraining order be dissolved and that the cause be dismissed.

The application and license were introduced in evidence. E. B. Ford testified that he was an investigator for the State Revenue Department, and had held this position on January 22 and 23, 1937; is familiar with the place of business known as the Ohio Club, located at 336 Central Avenue, Hot Springs, Arkansas; visited this place on January 22, 1937; they were selling beer in the place, and had a bookmaking joint running in full blast and, also, gambling tables; they had a big board on the wall with horses listed on it, taking bets, announcing results of races, cashier was paying off, touts were touting; there was a dice game and slot machine; there were about 75 or 80 people there; does not know whether the Kentucky Club at 314 Central Avenue is the same establishment or not; visited this place on January 22, 1937, they were selling beer in the place, and witness saw a bookmaking joint and a big board on the side of the wall with horses listed on it and men taking bets and paying bets, and barkers on duty announcing results; on that day there were about thirty-five people present. Witness is

familiar with the place known as the Southern Club, located at 248 Central Avenue; visited this place on January 22, 1937; they were selling beer downstairs; did not notice any up in the club room saw more law violations there than he ever saw in any one place before; they consisted of bookmaking, a big board on the wall, horses posted on it, men taking and paying bets on horse races, barkers on duty, roulette table, dice table, poker table, some other machines that witness never saw before, and about 150 people present, women, young boys, men, colored and white. Witness again visited Kentucky Club at 314 Central Avenue on January 23, the following day; there were about the same violations in progress as there were the day before. Visited the Ohio Club on the 23rd and there were about the same violations as there were the day before; also visited the Southern Club and found the same violations as there were the day before; did not see any liquor stored or secreted around the premises; saw them taking bets and paying off with money; did not report this condition to any of the local officials of Hot Springs or Garland county; did not talk to any of the managers of these places; did not give any notice or warning that that condition was prohibited by the beer permit; does not know whether he saw Blum at the Kentucky Tap Room; at the Kentucky Tap Room the bookmaking was taking place back of the bar room; the board was up on the left side as you go in; the building faces Central Avenue; the bookmaking was in the back of the building; bar and drinking place in front; and there were swinging doors which witness thinks were open all the time; does not know who was operating the gambling business, and did not make any effort to find out; does not know that Blum knew anything about it; all witness knows is that it was in operation in the same building with the beer saloon and bar; did not see Mr. Young at the Ohio Club; that building faces Central Avenue; swinging doors separate the bookmaking place from the beer place; did not notify any one to stop making books; was not his business to do so; his duty was to report violations to the commissioner; does not know who

was operating the book in the Ohio Club; saw slot machines; dice games, a fifty cent game; saw boys eighteen and nineteen years playing the book; did not see any liquor over 5 per cent. secreted, sold or concealed about the premises; once or twice saw people drunk; was reporting conditions existing in Hot Springs; it was not his business to revoke beer permits; did not see any betting or gambling in the beer or bar room at the Southern Club; the gambling was upstairs and the stairs were open; no doors separated them; did not see any beer sold upstairs nor any liquor secreted or hid around the beer department; did not see any one drinking liquor; does not recall seeing Mr. Phillips at the Southern Club; the two downstairs places had swinging doors between them; witness has been at the clubs at ten in the morning, two in the afternoon, and four in the afternoon. Was at the Kentucky Club on January 22 at 4:30 and 4:45 p. m.; at the Ohio Club, 4:00 and 4:15; at the Southern Club, 5:20 and 5:45. Legislature was in session at the time witness made the investigation. At the Kentucky and Ohio clubs everything was on one floor; at the Southern, there were two entrances and the gambling was conducted upstairs.

Neil Shannon, Robert Faust, J. O. Blucker, officers, testified about the gambling in the three clubs named above. Emmett Jackson testified that he was city clerk in April, 1936; he had his record with him, and it showed that Louis Blum paid a fine of $100 for selling liquor by the drink in April, 1936. Bernard Altmeyer paid a fine of $100 for selling liquor on Sundays. These convictions, however, were before the permits which were revoked were issued.

Louis Blum testified at length. He stated that he operated the Kentucky Tap Room; that his bar tender sold liquor without permission and he fired him in 1936; that there was no betting in his place that he knew about, and no liquor stored in the beer department; that he never did have crap games running there or slot machines; that he usually gets there about nine o'clock and stays until one, two or three o'clock in the morning; there

was no gambling conducted on his premises, and no gambling going on there the 22nd and 23rd of January, this year; all they sell is beer and soft drinks; he said he never was convicted in municipal court of selling whiskey on Sunday, and did not pay the fine; loaned Mr. Gage the money to pay the fine; Gage was working for him and sold whiskey without his consent.

Tink Young testified that he operated the Ohio Club and had a permit to operate a beer bar; had never kept or secreted any liquor on the premises; he heard the testimony about betting on horse races and knows about that; the cigar store and bar are in the front room, probably forty feet deep; then there is a partition to the top of the ceiling with swinging doors; which cuts the two rooms in two; that he was part owner of the Ohio Cigar Store at 336 Central Avenue, and that he was the person who applied for permit No. 515 to sell beer at the Ohio Cigar Store; that the testimony about gambling was partly correct.

Jimmy Phillips testified that he was manager of the Southern Grill; also manager of the beer parlor; the license was issued to W. S. Jacobs and L. M. Kilgore; they had a party named Altmeyer accused of selling on Sunday, and they arrested witness for selling by the drink; this was in April, 1936; they went into the municipal court and asked for a continuance and Mr. Wiseman said he would revoke the license if they fought back so they went in and paid the fine; witness nor Mr. Jacobs nor Mr. Kilgore knew anything about it; they all are instructed to sell what the permit grants authority to sell; the book mentioned in the testimony is upstairs, not connected with the beer department; Mr. Jacobs had an interest in both of them, and witness managed the place; never allowed any one to violate the liquor laws; does not know anything about a two dollar bet on a horse race in April; that is out of his jurisdiction, upstairs, and witness very seldom goes upstairs, and does not know what goes on up there. Witness said they were located at 248-250-252 Central Avenue, and the Southern Club is upstairs, all in one building; sell beer in dining room, but

not upstairs; had a man employed by the name of Altmeyer and he paid $100 fine for selling whiskey.

The chancellor entered a decree confirming and sustaining the acts of the Commissioner of Revenues in revoking the beer permit of the three appellants; dissolved the temporary restraining order; dismissed the complaint for want of equity, and from this judgment comes this appeal.

Act No. 7, p. 19, of the Acts of 1933, 1st Ex. Sess., expressly provides that under the Constitution and laws of Arkansas the business of manufacturing, handling, receiving, distributing or selling the products named in the act to be a privilege. A portion of paragraph C of § 4 of the act provides that if a dealer has secured a permit for $10 or $15, when a larger amount should have been paid, he shall require the payment of the difference or cancel the permit. That paragraph, also, provides that the payment of the special tax shall be evidenced by a permit issued by the Commissioner of Revenues; it must be applied for by the taxpayer and issued by the commissioner on such forms and under such regulations as may be prescribed.

Section 6 of the act provides that the Commissioner of Revenues shall jointly, with the prosecuting attorney, sheriffs and other law enforcing officers, have supervision of the enforcement of this act, and shall be charged with the full administration thereof, and shall from time to time promulgate the necessary rules and regulations for the enforcement and administration of this act.

Section 13 of the act provides that before any permit shall be issued and delivered to any applicant therefor, such applicant shall make and subscribe to an oath, and, among other things, the oath shall state that he will not knowingly allow any other person to violate any statute while in or upon such premises, and that no manufacturer, distributor, wholesale dealer to whom or to which this act applies, shall have any interest directly or indirectly in the business, etc.

Section 17 provides for the punishment of persons convicted of violating any provisions of the act, and fur-

ther provides that such permit shall, from and after the date of conviction, be void.

A part of § 25 provides that when it shall appear to the city clerk, recorder, or to the county clerk that a retail dealer has secured a permit for $15 when a larger amount should have been paid, he shall require the payment of the difference or cancel the permit.

Act No. 108, p. 258, of the Acts of 1935, known as the Arkansas Alcoholic Control Act, provides for the enforcement of said act by the Commissioner of Revenues, and authorizes him to grant and revoke for cause permits issued under said act. That act excepts wines from its provisions, but does not except beer.

Section 13 of act 108 provides that any permit issued pursuant to the act may be revoked for cause, and must be revoked for the following causes, naming them.

It is the contention of the appellants that the Commissioner of Revenues has no authority to revoke beer permits under act No. 7 unless the permittee has been convicted of one of the violations set forth in said act, and that said conviction should take place during the time the permit revoked was in force.

This act charges the Commissioner of Revenues with the enforcement and administration of the act, and if he knows or discovers by investigation that the law is being violated by the persons having a permit, he not only has the authority, but it is his duty to revoke or cancel the permit. The law requires the applicant for a permit to take an oath that he will not violate the law. It appears from the record that none of these appellants took this oath, and that in itself would be sufficient reason to cancel their permits. It is true that the permits were issued by the former Commissioner of Revenues, but no matter by whom issued, the appellants were not relieved from taking the oath required by law. Selling beer is a privilege, and not a right, and the state has an absolute right to control it or to require the Commissioner of Revenue to administer the act and enforce it, and if necessary to accomplish these purposes, he may cancel or revoke a permit that has been issued.

Act 108 above referred to provides that the dealer may appeal to the chancery court, and that is what the appellants did in this case. It would be the duty of the chancery court to hear the evidence, and if there was not sufficient evidence to show a violation of the law, then the court would restrain the commissioner from cancel--ing their permit. In this case, however, the great preponderance of the evidence showed violations of the law, which justified the commissioner of revenues in canceling their permits.

Appellants call attention to several cases, one of them In re Sarlo, 76 Ark. 336, 88 S. W. 953. In that case the court said: ''The authorities are practically uniform in holding that a liquor license is a mere privilege, revocable at the will of the state. It is not a contract between the state and the licensee, and no property rights inhere in it. Constitutional limitations against impairing obligations, retroactive laws, etc., cannot be invoked in support of rights under it. It is not a vested right for any definite period; in fact, is not a vested right at all, but is a mere permission temporarily to do what otherwise would be a violation of the criminal laws. * * *

''The power of the state over liquor licenses is complete. It is part of the internal police of the state, in which the power of the state is sovereign. The state may repeal the statute authorizing the license; revoke, annul or modify the license; create conditions, limitations and regulations subsequent to its issue burdening its exercise; and may delegate these powers to agencies of the state, as municipal corporations, county courts, boards of excise commissioners, etc.''

The general statement of the law is contained in 15 R. C. L. 285 as follows: ''Generally, however, and from other viewpoints, especially from the standpoint of the right and power of revocation, a liquor license is regarded as anything but a property or contract right. It is consistently declared to be a mere personal and temporary permit or privilege to do what could not be lawfully done without it, and not property in any legal or constitutional sense; and its issuance is a matter, not of

right, but purely of legislative grace, and may be extended, limited or denied without violating any constitutional right. * * *

"One who accepts a license must be deemed to consent to all proper conditions and restrictions which have been or may be imposed by the Legislature in the interest of public morals and safety relative to the traffic or to the place in which he sells. In other words, the licensee takes subject to the reasonable exercise of the police power. The license is not a contract between the government and the licensee, and it creates no vested rights, any more than does the charter of a social club create rights beyond revocation for violation of the liquor laws; nor can any vested rights be created under a license by the acquisition and use of the instrumentalities necessary to the business.

The state has authority at any time to revoke a license to sell liquor because it is a mere privilege and in no sense a contract right. It is a privilege to do what could not be lawfully done without the permit, and the permit or license is a matter, not of right, but, as stated in R. C. L., "purely of legislative grace" and may be extended, limited or denied without violating any constitutional right.

We think the law, when properly construed, authorizes the Commissioner of Revenues, after he has made an investigation, which investigation shows a violation of the law, to cancel the permit. He cannot do this arbitrarily, but can only do it after an investigation that discovers violation of the law by the permittee. In all cases of revocation and cancellation of a permit, the dealer may appeal to the chancery court, and that court will determine whether there were sufficient grounds for the action of the commissioner.

There appears to be ample evidence in this case to authorize the Commissioner of Revenues to take the action he did, and the decree of the chancery court is affirmed.